UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LOUIS V. DOSS and CAROLYN DOSS, Individually and d/b/a MULLIGAN'S PUB, | § § § § | Cv. No. SA:11-CV-00116-DAE |
| Plaintiffs, | § § | |
| vs. | § § | |
| TABC AGENT SCOTT HELPENSTELL, | § § § | |
| Defendant. | § § | |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

On September 22, 2014, the Court heard argument on the Motion for Summary Judgment filed by Defendant Texas Alcoholic Beverage Commission ("TABC") Agent Scott Helpenstell ("Helpenstell") (Dkt. # 178.)  Demetri Anastasiadis, Esq., appeared on behalf of Helpenstell, and Louis Doss and Carolyn Doss appeared pro se.  After careful consideration of the memoranda in support of and in opposition to the Motion, and in light of the parties' arguments presented at the hearing, the Court, for the reasons that follow, **GRANTS IN PART AND DENIES IN PART** Helpenstell's Motion for Summary Judgment on the Basis of Qualified Immunity.

1

BACKGROUND

On February 9, 2011, Plaintiffs Louis V. Doss and Carolyn Doss (collectively, "Plaintiffs"), individually and doing business as Mulligan's Pub, instituted this lawsuit against the City of Kerrville, numerous Kerrville police officers, Administrator Alan Steen of the Texas Alcoholic Beverage Commission ("TABC"), and TABC Agent Scott Helpenstell under 42 U.S.C. §§ 1981 and 1983 for violations of the Fourth and Fourteenth Amendments.  (Dkt. # 1.)  The only claims that remain are § 1983 claims against Helpenstell under the Fourth and Fourteenth Amendments for subjecting Plaintiff Louis Doss to excessive force and unreasonable search and seizure.  ("TAC," Dkt. # 76 ¶ 59.)

Plaintiffs own and operate Mulligan's Pub (the "Pub"), a bar located in Kerrville, Texas.  (Id. ¶¶ 12–14.)  According to Plaintiffs, from the very beginning of the Plaintiffs' ownership of the Pub, the City of Kerrville, through its police department, sought to have the Pub close again.[1]  (Id. ¶ 19.)  Plaintiffs assert that as the percentage of minority patrons increased at the bar, the harassment from the Kerrville Police Department also increased.  (Id.)  The alleged harassment included complaints to the TABC about activities at the Pub when similar actions at other establishments were not reported.  (Id. ¶ 23.)  Plaintiffs assert that at some point, the Kerrville Police Department began working with the "direct

---

[1] The Pub was temporarily closed at the time Plaintiffs purchased it.

2

cooperation" of the TABC, including Agent Helpenstell, in their efforts to close the Pub.  (Id. ¶ 27.)

On November 12, 2010, the TABC and Kerrville Police Department "jointly performed an all out raid" on the Pub.  (Id. ¶ 34.)  According to Plaintiffs, five TABC agents, including Agent Helpenstell, "charged into the bar" with several Kerrville police officers.  (Id.)  The agents and officers "searched identifications of the customers, checked for minors, and conducted sobriety tests." (Id.)  Following this raid, Plaintiffs filed a complaint with the TABC Office of Professional Responsibility and named Agent Helpenstell in the complaint.  (Id. ¶ 38.)  Additionally, Plaintiffs sent an open records act request to the TABC to investigate the failure of other establishments to report breaches of the peace.  (Id. ¶ 39.)

On January 30, 2011, a Sunday morning, Plaintiff Louis Doss ("Doss") noticed a TABC vehicle parked at the nearby Southway Pub.  (Id. ¶ 41.) Noticing the TABC vehicle, Doss drove into the parking lot of an adjoining business.  (Id. ¶ 42.)  According to Doss, "[h]is intent was to document this vehicle by photographing it."  (Id.)  Using the camera on his cell phone, Doss got out of his vehicle and walked toward a fence separating Southway Pub from the adjoining business.  (Id.)  According to Plaintiffs' Complaint:

> [Doss] took a photograph of the car and the license plate.  At this
> point, TABC Agent Scott Helpenstell got out of his vehicle.  Mr. Doss

3

> took the agent's picture and told him he had just taken his picture. Agent Helpenstell became furious and began yelling and walking towards Mr. Doss. Mr. Doss got into his vehicle. At this point, Agent Helpenstell began running toward the Doss vehicle.

(Id.) Though the parties disagree about what occurred between Helpenstell and Doss while Doss was in his vehicle, it is undisputed that at some point Doss was forcibly removed from his vehicle by Helpenstell and arrested. As a result of the altercation, Plaintiff asserts that he suffered injuries to his shoulder, wrists, thumb, hip, elbow, nose, and head. (Id. ¶ 51.)

Following the incident, Plaintiff was taken to jail where he was held overnight and charged with resisting arrest with a deadly weapon and disorderly conduct. (Id. ¶ 49.) The resisting arrest charge was subsequently dropped when the grand jury did not return an indictment. (Id. ¶ 53.) Later, the disorderly conduct charge was dismissed. (Id.)

Plaintiffs assert that Helpenstell, acting in his capacity as an agent for the TABC and under color of law, caused Plaintiff to be subjected to an unwarranted search and seizure and excessive force, depriving him of his rights under the Fourth and Fourteenth Amendments. (Id. ¶ 59.)

Defendant Helpenstell filed the instant Motion for Summary Judgment On the Basis of Qualified Immunity. (Dkt # 178.) Plaintiffs responded (Dkt. # 209), and Helpenstell filed a Reply (Dkt. # 210). Additionally, Defendant

4

has filed a Notice of Supplemental Authority (Dkt. # 211), to which Plaintiffs have responded (Dkt. # 213).

<u>STANDARD OF REVIEW</u>

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251–52 (1986). The main purpose of summary judgment is to dispose of factually unsupported claims and defenses. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323–24 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. <u>Id.</u> at 323. If the moving party meets this burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial. <u>ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.</u>, 699 F.3d 832, 839 (5th Cir. 2012). The Court "examines the pleadings, affidavits, and other evidence introduced in the motion, resolves any factual doubts in favor of the non-movant, and determines whether a triable issue of fact exists." <u>Leghart v. Hauk</u>, 25 F. Supp. 2d 748, 751 (W.D. Tex. 1998).

In deciding whether a fact issue exists, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make

5

credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing</u>
<u>Prods., Inc.</u>, 530 U.S. 133, 150 (2000).  However, "[u]nsubstantiated assertions,
improbable inferences, and unsupported speculation are not sufficient to defeat a
motion for summary judgment." <u>Brown v. City of Hous.</u>, 337 F.3d 539, 541 (5th
Cir. 2003).  "Where the record taken as a whole could not lead a rational trier of
fact to find for the non-moving party, there is no 'genuine issue for trial.'"
<u>Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)
(quoting <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

  "[Non-movants] are required to identify the specific evidence in the
record and to articulate the precise manner in which that evidence supports their
claim." <u>Leghart v. Hauk</u>, 25 F. Supp. 2d 748, 751 (W.D. Tex. 1998).  Further,
"Rule 56 does not require the district court to sift through the record in search of
evidence to support a [non-movant's] opposition to summary judgment.  <u>Id.</u>

  If a party "fails to make a showing sufficient to establish the existence
of an element essential to that party's case, and on which that party will bear the
burden of proof at trial," the Court must grant summary judgment against that
party.  <u>Celotex</u>, 477 U.S. at 322.

<u>ANALYSIS</u>

  Helpenstell moves for summary judgment, arguing that he is entitled
to qualified immunity on Plaintiffs' § 1983 claims.  (Dkt. # 178.)

6

Section 1983 provides a civil cause of action to persons who have been "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States through the actions of an individual acting under color of state law.  42 U.S.C. § 1983.  However, government officials are shielded from civil damages by the doctrine of qualified immunity when "performing discretionary functions . . . if their actions were objectively reasonable in light of the then clearly established law." Bazan ex rel. Bazan v. Hidalgo Cnty., 246 F.3d 481, 488 (5th Cir. 2001).  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity provides not only immunity from damages, but also immunity from the lawsuit itself, Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), and "promotes the necessary, effective, and efficient performance of governmental duties, by shielding from suit all but the plainly incompetent or those who knowingly violate the law." Tolan v. Cotton, 713 F.3d 299, 301 (5th Cir. 2013) cert. granted, judgment vacated, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (U.S. 2014) and aff'd in part, vacated in part, remanded, 12-20296, 2014 WL 2726678 (5th Cir. June 17, 2014) (quoting Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008) (internal quotation marks omitted)).  Thus,

qualified immunity serves the dual purpose of holding government officials accountable when their power is exercised unreasonably and protecting those officials from "harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

The Court applies a two-prong test to determine whether a defendant is entitled to qualified immunity. Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson v. Callahan, 555 U.S. 223, 236 (2009). The first prong evaluates whether a constitutional right was violated. Id. The second prong examines whether the allegedly violated constitutional right was clearly established at the time of the conduct. Id. In Pearson, the Supreme Court announced that a court may choose which prong of the Saucier test to address first. 555 U.S. at 236. Moreover, the Supreme Court recognized that addressing the second prong of the Saucier test first "comports with [the] usual reluctance to decide constitutional questions unnecessarily." Reichel v. Howards, 132 S.Ct. 2088, 2093 (2012).

I.     Excessive Force Claim

In analyzing Plaintiff's excessive force claim, the Court will address the second prong of the Saucier test first.[2] The second prong of Saucier "is better

---

[2] As to the first prong, in this case, "[i]t is well settled that if a law enforcement officer uses excessive force in the course of making an arrest, the Fourth Amendment guarantee against unreasonable seizure is implicated." Harper v. Harris Cnty. Tex., 21 F.3d 597, 600 (5th Cir. 1994).

understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law." Tarver v. City of Edna, 410 F.3d 745, 750 (5th Cir. 2005); see Katz, 533 U.S. at 202. ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). The inquiry into these intertwined questions focuses on whether the officer "violated clearly established . . . constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "A right is clearly established if, in light of preexisting law, the unlawfulness of an action would be apparent to a reasonable officer." Manis v. Lawson, 585 F.3d 839, 845–46 (5th Cir. 2009).

Doss had a clearly established right to be free from excessive force. Tarver, 410 F.3d at 753. "In Fourth Amendment excessive force cases, the reasonableness question amounts to 'whether the totality of the circumstances justifies a particular sort of seizure.'" Autin v. City of Baytown, 174 F. App'x 183, 185 (5th Cir. 2005) (quoting Tennessee v. Garner, 471 U.S. 1, 8–9 (1985)). It was clearly established at the time of the incident that the amount of force that Helpenstell could use "depend[ed] on the severity of the crime at issue, whether

the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee." Deville v. Marcantel, 567 F.3d 156, 169 (5th Cir. 2009); Autin v. City of Baytown, 174 F. App'x 183, 185 (5th Cir. 2005) ("Important factors to be considered include the severity of the crime, whether the actor poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.").

Thus, the issue here becomes whether, looking at the alleged facts, a reasonable officer would have known that the degree of force was unconstitutionally excessive under the circumstances. Deville, 567 F.3d at 169 (citing Bush v. Strain, 513 F.3d 492, 502 (5th Cir. 2008)).

The evidence presented in this matter is essentially each party's conflicting testimony of what occurred that day. What is undisputed is that Doss approached Helpenstell from behind in an effort to take photographs of him and his vehicle parked at the Southway Pub. It is also undisputed that Doss then returned to his vehicle, and, after a short amount of time,[3] Doss was forcibly removed from his vehicle by Helpenstell. The Court will recount each party's version of the facts.

Helpenstell testifies in his sworn deposition that as he walked towards Southway Pub from his vehicle, he heard someone call out something to the effect

---

[3] The parties disagree about what occurred during this time period.

"Hey, I've got you now" in a loud, "threatenin' type manner." ("Helpenstell

Dep.," Dkt. # 178, Ex. 3 at 4:155–156.) Caught off guard, Helpenstell asserts that

he turned around to see a man holding something in his hand. Helpenstell states:

> So I turned to see who was talkin' to me. It caught me off guard.
> And I looked back and there's a chain link fence and on the chain link
> fence there's some old dead vines and growth and stuff up hangin' off
> the fence. And I look and I see the gentleman standing back there and
> he looked like an older heavy-set gentleman and he had somethin' in
> his hand like this. It didn't appear to be a gun but, you know, I
> couldn't really tell what he was holdin' in his hand. I said, "Who are
> you? What are you doin'?" He's like, "I don't have to tell you
> anything but I've got you now." So at that point I thought, okay, I
> need to investigate this a little bit further. Especially with a rash of
> violence against police officers that's been going on – just the
> suspicious activity. . . .

(Helpenstell Dep. 5:181–188.) Helpenstell further states "I thought it might be a

cell phone or somethin' like that – but I couldn't say clearly what it was. So the

fact that he was pointin' something at me that I couldn't identify and makin' those

statements I felt it be prudent on my part to investigate further." (Id. 6:249–252.)

Helpenstell avers that he felt "alarmed" at this point and, as the man started

walking away, he repeatedly asked "Who are you?" and "What are you doing?"

(Id. 9:361–389.) At some point before entering the vehicle, the man shouted "I'm

Lou Doss," but only after repeatedly saying "I don't have to tell you anything but

I've got you now." (Id. 10:429–431.) Helpenstell states that he was familiar with

Doss, and had seen him only once, but had dealt with him via phone before; he

11

characterized Doss as "a very difficult person to deal with" and a "[v]ery

aggressive person – very confrontational type person." (Id. 11:490–492.)

Helpenstell then started around the fence to confront Doss and states

"I didn't see him but he had gotten inside the vehicle and the window was rolled

up." (Id. 10:425–426.)   Helpenstell states that he asked Doss for his driver's

license, but Doss refused to comply, instead repeating that he "didn't have to show

[Helpenstell] anything." (Id. 11:483–484.)  At this point, Helpenstell went to his

vehicle to retrieve his cell phone to call for assistance, stating he felt that he needed

assistance because of "[w]hat [he] had seen him holding in his hand" and "his

aggressive loud tone." (Id. 15:640–642.)  Specifically, "[t]he fact that he was

pointin' somethin' toward me that I wasn't sure what it was.  And he said 'I've got

you.  I've got your ass now.'" (Id. at 642–43.)  Next, Helpenstell states:

> When I get back up to his vehicle, . . . he was extendin' two items
> through the window to me – one being his Texas Driver's License and
> the one being his, uh, [concealed handgun license].  So I took those
> items and then I ask him, "Do you have a firearm – uh, do you have a
> weapon on you at this time?"  I think I said weapon – I may have said
> firearm.  And at that point he said, "I sure do," and he pulled out a
> Derringer—2-shot Derringer and held it in the air and just kind of
> wagged it like this and over in this area.

(Id. 15:657–666.)  At that point, Helpenstell states he was "scared [he] was gonna

get shot" and thought he was "about to be in a gunfight." (Id. 16: 658, 682.)

Helpenstell asserts he then drew his pistol and pointed it at Doss, and Doss slowly

put the pistol back down.  (Id. 17:760–761.)  Helpenstell states:

> At that time I ordered him to put his hands on the steering wheel where I could see 'em.  My ultimate goal was to get him to reach over, open the door and get out of the vehicle.  He put – he complied with the puttin' his hands on the steerin' wheel but he started yellin' "Shoot me.  Kill me.   You're gonna have to kill me."  And  was ordering him, "Sir, get out of the vehicle.  Reach over, open the door, get out of the vehicle."  He kept refusin', "I'm not gonna do it.  You're gonna have to shoot me.  You're gonna have to kill me."

(Id. 17:762–18:768.)  When Doss still refused to get out of the vehicle, Helpenstell

re-holstered his weapon and reached in to open the door:

> I reached in, unlocked the door and I pulled the door open.  At that time I put my hand – my – my left hand back on my pistol without drawin' it and ordered him to get back out of the vehicle – to get out of the vehicle.  He continued to refuse sayin', "You're gonna have to shoot me.  You're gonna have to kill me."  I then reached in with my right hand.

(Id. 20:893–897.)  Helpenstell asserts that Doss resisted him, yelling "Let me go.

Let go of me" (Id. 21:923–924), and when Helpenstell saw Doss's right hand go

"down to the area where the pistol was," he decided to grab Doss by his collar and

around the shoulders and pull him out of the vehicle.   (Id. 22:951–974.)

Doss, on the other hand, states in his affidavit that when Helpenstell

turned around as he was walking to the Southway Pub he asked Doss, "Doss what

are you doing?" and Doss replied to him "I took your picture."  ("Doss Aff.," Dkt.

# 209, Ex. B ¶ 37(f).)  Ostensibly, Doss asserts that Helpenstell recognized Doss

immediately and knew that Doss had taken a photo, which angered Helpenstell.[4]

Doss asserts that when he returned to his car, he gave Helpenstell his driver's

license and concealed handgun license because he was required by law to do so

when asked for his identification.[5]  According to Doss, after he handed Helpenstell

the licenses, he put both of his hands on the steering wheel.  Doss states that a

weapon was never brandished, but remained in the center console at all times.

Once Helpenstell opened the car door,[6] Doss avers that Helpenstell brutally

attacked him with "punches to the face and strikes to [his] head with a pistol"

causing impacts "so hard they [knocked] him unconscious."  (Doss Aff. ¶ 37(p).)

   For purposes of summary judgment, "[t]he evidence of the nonmovant

is to be believed, and all justifiable inferences are to be drawn in his favor."  Tolan

v. Cotton, 134 S. Ct. 1861, 1863, 188 L. Ed. 2d 895 (2014) (citing Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

---

[4] Doss attests that Helpenstell knew the item pointed at him was a camera;
however, such evidence is not competent summary judgment evidence which must
be based upon personal knowledge—Doss could not have personal knowledge of
what Helpenstell believed the item pointed at him was at that time.  See Fed. R.
Civ. P. 56(c)(4).  That he may have found out it was a camera at a later time is
irrelevant.

[5] Doss does however concede that he did not immediately comply with
Helpenstell's request for identification.  (Dkt. # 209 at 7.)

[6] Doss admits that he did not comply with Helpenstell's demands to get out of the
vehicle.  (Dkt. # 209 at 8 ("Helpenstell demanded that Doss get out of the vehicle.
Fearing for his safety, Doss rolled down the window a little more in an effort to
talk to Helpenstell." (internal citations omitted)).)

In Thomas v. Murray, 107 F. Supp. 2d 738 (N.D. Tex. 2000), the court analyzed whether the amount of force used by a police officer was objectively reasonable. There, the court held that based on undisputed facts, Murray's use of force was not objectively unreasonable under the circumstances, and noted "the right to make an arrest or investigatory stop necessarily carries with it the right [to] use some degree of force, if necessary, to effect the investigatory stop,." Id. at 758. In that case, it was undisputed that Thomas refused to surrender his pistol to Murray and that Thomas was "talking loudly and appeared agitated." Id. Although Thomas argued that no force was necessary because he never removed the pistol from his hip pocket, the court noted that "[a] police officer should be able to conduct an investigation without any threats or potential threats to his safety of that of others." Id. Thus, "[g]iven the facts and circumstances of this case, a reasonable police officer could have believed that it was necessary to disarm Thomas for safety reasons while he conducted his investigation, even though the pistol remained in Thomas's hip pocket at all times." Id.

Likewise, here, even assuming that Doss did not brandish the pistol, a reasonable officer could have believed it was necessary to distance Doss from the firearm for safety reasons once he knew the weapon was in the car. However, as to Doss's allegations that Helpenstell not only forcibly removed him from his car, but attacked him with "punches to the face and strikes to [Doss's] head with a pistol"

15

causing impacts "so hard they [knocked] him unconscious," (Doss Aff. ¶ 37(p)),

there is a genuine issue of material fact as to whether that conduct occurred, and if

so, whether that conduct was reasonable.  If, as Doss avers, he had his hands on the

steering wheel the entire time, never brandished a weapon, and Helpenstell opened

the car door to punch him repeatedly in the face and strike his head multiple times

with a pistol, Doss has created a genuine issue of material fact as to whether

Helpenstell's conduct was reasonable.

In Staten v. Adams, the court concluded that "were a jury to consider

plaintiff's version of the facts that an officer pistol-whipped plaintiff while plaintiff

was sitting in the car with his hands up, it could conclude that such force was

excessive and unreasonable to the need, even if plaintiff had failed to comply with

orders to get out of the car and snatched his hands away as the officers attempted

to cuff him."  939 F. Supp. 2d 715, 731.  Thus, the court denied qualified immunity

to an officer that plaintiff alleged had pistol-whipped him during the arrest.  Id.

Although the determination of the objective reasonableness of an

officer's act is typically one made as a matter of law, Mangieri v. Clifton, 29 F.3d

1012, 1016 (5th Cir. 1994), that determination may be inappropriate when there are

"underlying historical facts in dispute that are material to the resolution of the

questions whether the defendant[] acted in an objectively reasonable manner."  Id.

(citing Lampkin v. City of Nacogdoches, 7 F.3d 430, 435 (5th Cir. 1993)).  Thus,

16

while certainly there are circumstances where pistol-whipping, punching, and even deadly force may be considered objectively reasonable based on <u>undisputed</u> facts; here, the critical underlying facts are disputed.  Where a "court would be unable to make the determination of the objective reasonableness of the officer's activities 'without settling on a coherent view of what happened in the first place,'" <u>Mangieri</u>,  29 F.3d at 1016, the court cannot make a determination of objective reasonableness of an officer's conduct, and the court must deny qualified immunity.  <u>See</u> <u>Staten</u>, 939 F. Supp. 2d at 731 ("Determination of the objective reasonableness of Officer Adams' conduct, therefore, requires this Court to 'settl[e] on a coherent view of what happened in the first place.'  Accordingly, Officer Adams is not entitled to qualified immunity on plaintiff's claims that Adams pistol-whipped him during arrest." (internal citations omitted)).

Here, material underlying facts are disputed: namely whether the gun was ever brandished, whether Doss's hands remained on the wheel the entire time, whether Doss was screaming things at Helpenstell, whether Doss resisted Helpenstell's attempts to pull him out of the vehicle, and the extent of force that was used.  Assuming Doss's version of the facts (as the Court must do on summary judgment) Doss has created a genuine issue of material fact such that a jury could conclude that such force was excessive and unreasonable.  Accordingly, the Court

**DENIES** Helpenstell's Motion for Summary Judgment on the basis of qualified immunity for Plaintiff's excessive force claim.

## II.   Unlawful Arrest Claim

Plaintiffs also assert that Helpenstell, acting in his capacity as an agent for the TABC and under the color of law, caused the Plaintiff to be subjected to an unwarranted search and seizure in deprivation of his rights under the Fourth Amendment.  (TAC ¶ 59.)   Helpenstell moves for summary judgment on the basis of qualified immunity, arguing that he acted reasonably in detaining or arresting Doss.  (Dkt. # 178 at 11.)

Again, the Court will first address the second prong of Saucier, which asks whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendant was objectively unreasonable in light of the then clearly established law.  Tarver v. City of Edna, 410 F.3d 745, 750.  An individual has a clearly established right to be free from unlawful arrest.  Duckett v. City of Cedar Park, 950 F.2d 272, 278 (5th Cir. 1992).  An arrest or detention may be unlawful it if is accomplished without due process of law.  Baker v. McCollan, 443 U.S. 137, 144–45 (1979).

Pursuant to Terry v. Ohio, 392 U.S. 1 (1968), officers may stop and briefly detain an individual for investigative purposes if they have reasonable suspicion that criminal activity is afoot.  "Reasonable suspicion must be supported

by particular and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant an intrusion." United States v. Michelletti, 13 F.3d 838, 840 (5th Cir. 1995).  "The presence or absence of reasonable suspicion must be determined in light of the totality of the circumstances confronting a police officer, including all information available to the officer at the time of the decision to stop a person." Goodson v. City of Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000).  The reasonable suspicion standard is less demanding than the probable cause standard.  Goodson, 202 F.3d at 736.

An arrest is unlawful unless it is supported by probable cause.  Flores v. City of Palacios, 381 F.3d 391, 402 (5th Cir. 2004).  "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." Mesa v. Prejean, 543 F.3d 264, 269 (5th Cir. 2008) (quoting United States v. McCowan, 469 F.3d 386, 390 (5th Cir.2006).  "A mistake reasonably made as to probable cause justifies qualified immunity." Mesa, 543 F.3d at 269.

Helpenstell argues that "[d]ue to the ambush situation created by Plaintiff crouching unexpectedly behind a fence and partially concealed by vegetation 20 feet away with an object pointed at Helpenstell, who had the Sunday morning 10:40 a.m. sun in his eyes, Helpenstell could reasonably have believed the

19

object in Doss's hand was a weapon in violation of Tex. Pen. Code 42.01(a)(8)."

(Dkt. # 178 at 8.)

> Section 42.01 of the Texas Penal Code provides:

> (a) A person commits an offense if he intentionally or knowingly:

> . . .

> (8)  Displays a firearm or other deadly weapon in a public place in a
> manner calculated to alarm;

Tex. Pen. Code Ann. § 42.01(a)(8).  Helpenstell argues that once Doss retreated to

his car, Helpenstell was authorized to arrest him pursuant to Texas Code of

Criminal Procedure 14, which provides:

> Art. 14.03.  AUTHORITY OF PEACE OFFICERS.  (a) Any peace
> officer may arrest, without warrant:

>> (1) persons found in suspicious places and under circumstances
>> which reasonably show that such persons have been guilty
>> of some felony, violation of Title 9, Chapter 42, Penal Code,
>> breach of the peace, or offense under section 49.02 Penal
>> Code, or threaten, or are about to commit some offense
>> against the laws;

Tex. Code Crim Proc. art. 14.03.  Helpenstell argues that a similarly situated

officer would reasonably have suspected Doss of publicly displaying a deadly

weapon in a manner calculated to alarm in violation of Texas Penal Code

§ 42.01(a)(8).  Further, he asserts that after Doss showed Helpenstell his concealed

handgun license, "based upon Doss' behavior and reasonably fearing for his

safety," Helpenstell was lawfully authorized to arrest Doss and attempt to separate

him from his pistol pursuant to § 411.207 of the Texas Government Code:

Sec. 411.207.  AUTHORITY OF PEACE OFFICER TO DISARM.

> (a) A peace officer who is acting in the lawful discharge of the
> officer's official duties may disarm a license holder at any
> time the officer reasonably believes it is necessary for the
> protection of the license holder, officer, or another
> individual.

Tex. Gov't Code. § 411.207.

In response, Doss argues that Helpenstell did not have reasonable

suspicion to follow him to his car because when Helpenstell saw Doss behind him,

Doss told Helpenstell he had taken his picture.  (Dkt. # 209 at 11–12.)  Because

"Doss's actions in standing outside in a parking lot and taking Defendant's

photograph with his cell phone did not give rise to reasonable suspicion nor

probable cause," Doss argues Helpenstell must be denied qualified immunity.  (Id.

at 12.)  In support of his assertion that Helpenstell knew Doss had taken his

picture, Doss attached the Kerrville Police Department Dash Camera Videos in

which Helpenstell can be heard stating that he knew Doss had snapped a picture of

him.  This video, however, is from after the incident when Doss was handcuffed on

the ground.  The presence or absence of reasonable suspicion must be determined

in light of the totality of the circumstances confronting a police officer, including

all information available to the officer <u>at the time of the decision to stop a person</u>.

<u>See</u> <u>Goodson</u>, 202 F.3d at 736.

      Even assuming Doss's version of the facts that Helpenstell knew he

had been photographed, Helpenstell could still have reasonably believed that Doss

may have held a weapon in his hand.  In other words, the fact that Doss may have

taken a picture when he was secretly standing behind Helpenstell and then told him

he had done so does not lead to the conclusion that Helpenstell could <u>only</u> believe

that Doss had a camera in his hand.  It is possible that Doss could have taken a

picture and when he surprised Helpenstell with an object in his hand, Helpenstell,

caught off guard and directly facing the sun, could have reasonably believed it was

a weapon.[7]

      In his affidavit, Doss avers that "[t]he statement that I had what

appeared to be an unidentified object in my hands it false.  It has been proven it

was a camera."[8]  (Doss Aff. ¶ 37(i).)  However, this is not competent summary

judgment evidence because Doss cannot possibly have personal knowledge of

---

[7] The picture of Helpenstell taken by Doss clearly shows Helpenstell with his
hands above his eyes in an effort to shade the sunlight.  Helpenstell's stance,
combined with the long shadows cast on objects in the picture, leads the Court to
conclude that the day of the incident was a particularly sunny day.

[8] Doss also avers in his affidavit that "[t]he statement that Helpenstell believed I
had a weapon in my hands is false."  (Doss Aff. ¶ 37(k).)  Again, Doss's statement
in this regard is not competent summary judgment evidence as he cannot have
personal knowledge of what Helpenstell believed at the time.

what Helpenstell believed the object in Doss's hand to be at the time he saw him.

Fed. R. Civ. P. 56.  In any event, the fact that Helpenstell later discovered the

object was a camera is irrelevant— again, reasonable suspicion is based on the

information available to the officer at the time of the decision to stop a person.

Goodson, 202 F.3d at 736.

>   According to Helpenstell's sworn testimony:

>   So I turned to see who was talkin' to me.  It caught me off guard.
>   And I looked back and there's a chain link fence and on the chain link
>   fence there's some old dead vines and growth and stuff up hangin' off
>   the fence.  And I look and I see the gentleman standing back there and
>   he looked like an older heavy-set gentleman and he had somethin' in
>   his hand like this.  It didn't appear to be a gun but, you know, I
>   couldn't really tell what he was holdin' in his hand.  I said, "Who are
>   you?  What are you doin'?"  He's like, "I don't have to tell you
>   anything but I've got you now."  So at that point I thought, okay, I
>   need to investigate this a little bit further.

(Helpenstell Dep. 5:181–188 (emphasis added).)  Doss also argues that the

following excerpt from Helpenstell's testimony shows he knew Doss had a cell

phone: "I couldn't really tell what it was.  Um, you know.  It didn't look like a gun

– it didn't have the shape of a gun.  I thought it might be a cell phone or somethin'

like that – but I couldn't say clearly what it was."  (Helpenstell Dep. at 260.)  This

excerpt, however, clearly states that Helpenstell did not know what the object was.

The Court must consider the totality of the circumstances confronting a police

officer when he makes a determination of reasonable suspicion—when startled and

caught off guard by a man from behind who is pointing an object at him that was

not clearly identified, a reasonable officer would have reasonable suspicion to further investigate and determine what, in fact, the object is.

Here, Helpenstell approached Doss's vehicle to investigate what he reasonably could have believed was a weapon.  Once Doss retreated to his vehicle, he does not dispute that he got into his vehicle and locked the doors and windows.  (Dkt. # 209 at 7.)  Further, Doss admits that when Helpenstell asked for Doss's identification, Doss did not comply with his request.  (Id. ("Doss did nothing for a few moments because he was confused as to why Helpenstell was asking for his identification.").)  Doss also concedes that he "ended up complying" with Helpenstell's request for identification and provided him with both his driver's license and concealed handgun license.  When asked if he had a gun in the vehicle, Doss admits that he responded "yes."  (Id. 7–8.)  Doss also admits that when Helpenstell demanded that he get out of the vehicle, Doss did not comply but "rolled down the window a little more."  (Id. at 8.)

An officer has authority pursuant to § 411.207 of the Texas Government Code to remove a license holder from a handgun if he reasonably believes it is necessary for his protection.[9]  Tex. Gov't Code § 411.207(a).  Here,

---

[9] Helpenstell testified that he was "scared" and "felt threatened."  (Helpenstell Dep. at 15:649, 16:682.)  Although Doss avers "[t]he statement that Helpenstell felt uneasy and alarmed is false," (Doss Aff. ¶ 37(k)), this is not competent summary judgment evidence because Doss's statement is not based on personal knowledge.  Doss cannot have personal knowledge of what emotions Helpenstell felt.

the undisputed facts show that Doss retreated to his vehicle after surprising Helpenstell from behind, locked his doors and windows, and did not comply with Helpenstell's request for identification.  When Doss ultimately provided Helpenstell with his concealed handgun license and told him he had a gun in the vehicle, a reasonable officer could have believed it necessary for his protection to separate (an admittedly) non-compliant Doss from his vehicle containing a gun. When ordered to get out of the vehicle, it is undisputed that Doss did not comply, but instead merely rolled down his window a little more.  (Dkt. # 209 at 8.) Helpenstell then forcibly removed Doss from his vehicle and placed him in handcuffs.  Based on Helpenstell's reasonable fear for his safety and Doss's non-complaint and aggressive behavior, the Court concludes that Helpenstell's actions were not objectively unreasonable.  Accordingly, the Court **GRANTS** Helpenstell qualified immunity on Plaintiffs' § 1983 unlawful arrest claim.

CONCLUSION

Based on the foregoing, Helpenstell's Motion for Summary Judgment on the Basis of Qualified Immunity (Dkt. # 178) is **GRANTED IN PART AND DENIED IN PART**.  The Court **DENIES** Helpenstell qualified immunity on Doss's excessive force claim, and **GRANTS** qualified immunity on Doss's unlawful arrest claim.

IT IS SO ORDERED.

DATED: San Antonio, Texas, September 26, 2014.

_____

David Alan Ezra
Senior United States Distict Judge

26